PHILLIP A. TALBERT
United States Attorney
MICHAEL D. ANDERSON
HEIKO P. COPPOLA
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO. 2:15-CR-0087 GEB |
|---|---|
| Plaintiff, | PLEA AGREEMENT |
| v. | DATE: TBD<br>TIME: 9:00 A.M. |
| MARY SUE WEAVER, | COURT: Hon. GARLAND E. BURRELL, JR. |
| Defendant. | |

## I. INTRODUCTION

### A. Scope of Agreement.

The indictment in this case charges the defendant with violation(s) of 18 U.S.C. § 1343 – wire fraud (Counts One - Six); 18 U.S.C. § 1341 – mail fraud (Counts Seven - Fifteen); 18 U.S.C. § 1344 - bank fraud (Counts Sixteen - Eighteen); and 18 U.S.C. § 1014 – false statements to a federally insured institution (Counts Nineteen – Twenty-one). This document contains the complete plea agreement between the United States Attorney's Office for the Eastern District of California (the "government") and the defendant regarding this case. This plea agreement is limited to the United States Attorney's Office for the Eastern District of California and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities.

### B. Court Not a Party.

PLEA AGREEMENT 1

The Court is not a party to this plea agreement. Sentencing is a matter solely within the discretion of the Court, and the Court may take into consideration any and all facts and circumstances concerning the criminal activities of defendant, including activities which may not have been charged in the indictment. The Court is under no obligation to accept any recommendations made by the government, and the Court may in its discretion impose any sentence it deems appropriate up to and including the statutory maximum stated in this plea agreement.

If the Court should impose any sentence up to the maximum established by the statute, the defendant cannot, for that reason alone, withdraw her guilty plea, and she will remain bound to fulfill all of the obligations under this plea agreement. The defendant understands that neither the prosecutor, defense counsel, nor the Court can make a binding prediction or promise regarding the sentence she will receive.

## II. DEFENDANT'S OBLIGATIONS

### A. Guilty Plea.

The defendant will plead guilty to Count One – Wire Fraud, in violation of 18 U.S.C. § 1343 and Count 17 – Bank Fraud, in violation of 18 U.S.C. § 1344. The defendant agrees that she is in fact guilty of these charges and that the facts set forth in the Factual Basis for Plea attached hereto as Exhibit A are accurate.

The defendant agrees that this plea agreement will be filed with the Court and become a part of the record of the case. The defendant understands and agrees that she will not be allowed to withdraw her plea(s) should the Court not follow the government's sentencing recommendations.

The defendant agrees that the statements made by her in signing this Agreement, including the factual admissions set forth in the factual basis, shall be admissible and useable against the defendant by the United States in any subsequent criminal or civil proceedings, even if the defendant fails to enter a guilty plea pursuant to this Agreement. The defendant waives any rights under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410, to the extent that these rules are inconsistent with this paragraph or with this Agreement generally.

### B. Restitution.

The Mandatory Victim Restitution Act requires the Court to order restitution to the victims of

1  certain offenses. Defendant agrees that her conduct is governed by the Mandatory Restitution Act
2  pursuant to 18 U.S.C. § 3663A(c)(1)(A)(ii) and agrees to pay the full amount of restitution to all victims
3  affected by this offense, including, but not limited to, the victims covered in the factual basis, victims
4  covered in those counts to be dismissed as part of the plea agreement pursuant to 18 U.S.C. §
5  3663A(a)(3), and other victims as a result of the defendant's conduct for the offenses charged from the
6  periods of June 2004 through April 2008. The United States estimates that restitution may exceed
7  approximately $22,905,178.10.
8      Defendant further agrees that she will not seek to discharge any restitution obligation or any part
9  of such obligation in any bankruptcy proceeding.
10      Payment of restitution shall be by cashier's or certified check made payable to the Clerk of the
11  Court.
12      The defendant understands that the Court may order restitution to be immediately payable
13  consistent with 18 U.S.C. § 3663A.

14      **C.**    **Fine.**
15      The parties agree that no fine is appropriate in this case.
16      **D.**    **Special Assessment.**
17      The defendant agrees to pay a special assessment of $200 at the time of sentencing by delivering
18  a check or money order payable to the United States District Court to the United States Probation Office
19  immediately before the sentencing hearing. The defendant understands that this plea agreement is
20  voidable at the option of the government if she fails to pay the assessment prior to that hearing. If the
21  defendant is unable to pay the special assessment at the time of sentencing, she agrees to earn the money
22  to pay the assessment, if necessary by participating in the Inmate Financial Responsibility Program.
23      **E.**    **Violation of Plea Agreement by Defendant/Withdrawal of Plea(s).**
24      If the defendant, cooperating or not, violates this plea agreement in any way, withdraws her plea,
25  or tries to withdraw her plea, this plea agreement is voidable at the option of the government. If the
26  government elects to void the agreement based on the defendant's violation, the government will no
27  longer be bound by its representations to the defendant concerning the limits on criminal prosecution
28  and sentencing as set forth herein. A defendant violates the plea agreement by committing any crime or

PLEA AGREEMENT             3

providing or procuring any statement or testimony which is knowingly false, misleading, or materially incomplete in any litigation or sentencing process in this case, or engages in any post-plea conduct constituting obstruction of justice. Varying from stipulated Guidelines application or agreements regarding arguments as to 18 United States Code section 3553, as set forth in this agreement, personally or through counsel, also constitutes a violation of the plea agreement. The government also shall have the right (1) to prosecute the defendant on any of the counts to which she pleaded guilty; (2) to reinstate any counts that may be dismissed pursuant to this plea agreement; and (3) to file any new charges that would otherwise be barred by this plea agreement. The defendant shall thereafter be subject to prosecution for any federal criminal violation of which the government has knowledge. The decision to pursue any or all of these options is solely in the discretion of the United States Attorney's Office.

By signing this plea agreement, the defendant agrees to waive any objections, motions, and defenses that the defendant might have to the government's decision. Any prosecutions that are not time-barred by the applicable statute of limitations as of the date of this plea agreement may be commenced in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement and the commencement of any such prosecutions. The defendant agrees not to raise any objections based on the passage of time with respect to such counts including, but not limited to, any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment to any counts that were not time-barred as of the date of this plea agreement. The determination of whether the defendant has violated the plea agreement will be under a probable cause standard.

In addition, (1) all statements made by the defendant to the government or other designated law enforcement agents, or any testimony given by the defendant before a grand jury or other tribunal, whether before or after this plea agreement, shall be admissible in evidence in any criminal, civil, or administrative proceedings hereafter brought against the defendant; and (2) the defendant shall assert no claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by the defendant before or after this plea agreement, or any leads derived therefrom, should be suppressed. By signing this plea agreement, the defendant waives any and all rights in the foregoing respects.

F.  **Asset Disclosure.**

The defendant agrees to make a full and complete disclosure of her assets and financial condition, and will complete the United States Attorney's Office's "Authorization to Release Information" and "Financial Affidavit" within five (5) weeks from the entry of the defendant's change of plea, including supporting documentation. The defendant also agrees to have the Court enter an order to that effect. The defendant understands that if she fails to complete truthfully and provide the described documentation to the United States Attorney's office within the allotted time, she will be considered in violation of the agreement, and the government shall be entitled to the remedies set forth in section II.E above, above.

G.  **Agreement to Cooperate.**

The defendant agrees to cooperate fully with the government and any other federal, state, or local law enforcement agency, as directed by the government. As used in this plea agreement, "cooperation" requires the defendant: (1) to respond truthfully and completely to all questions, whether in interviews, in correspondence, telephone conversations, before a grand jury, or at any trial or other court proceeding; (2) to attend all meetings, grand jury sessions, trials, and other proceedings at which the defendant's presence is requested by the government or compelled by subpoena or court order; (3) to produce voluntarily any and all documents, records, or other tangible evidence requested by the government; (4) not to participate in any criminal activity while cooperating with the government; and (5) to disclose to the government the existence and status of all money, property, or assets, of any kind, derived from or acquired as a result of, or used to facilitate the commission of, the defendant's illegal activities or the illegal activities of any conspirators.

### III. THE GOVERNMENT'S OBLIGATIONS

A.  **Dismissals/Other Charges.**

The government agrees to move, at the time of sentencing, to dismiss without prejudice the remaining counts in the pending indictment. The government also agrees not to reinstate any dismissed count except if this agreement is voided as set forth herein, or as provided in paragraphs II.E (Violation of Plea Agreement by Defendant/Withdrawal of Plea(s)), III.B.3 (Reduction of Sentence for Cooperation), VI.B (Estimated Guideline Calculation), and VII.B (Waiver of Appeal and Collateral

PLEA AGREEMENT 5

Attack) herein.

**B. Recommendations.**

1. Incarceration Range.

The government will recommend that the defendant be sentenced to the low end of the applicable guideline range as determined by the Court.

2. Acceptance of Responsibility.

The government will recommend a two-level reduction (if the offense level is less than 16) or a three-level reduction (if the offense level reaches 16) in the computation of her offense level if the defendant clearly demonstrates acceptance of responsibility for her conduct as defined in U.S.S.G. § 3E1.1. This includes the defendant meeting with and assisting the probation officer in the preparation of the pre-sentence report, being truthful and candid with the probation officer, and not otherwise engaging in conduct that constitutes obstruction of justice within the meaning of U.S.S.G § 3C1.1, either in the preparation of the pre-sentence report or during the sentencing proceeding.

3. Reduction of Sentence for Cooperation.

The government agrees to recommend at the time of sentencing that the defendant's sentence of imprisonment be reduced by up to 50% of the applicable guideline sentence if she provides substantial assistance to the government, pursuant to U.S.S.G. § 5K1.1. The defendant understands that she must comply with paragraphs II.H and not violate this plea agreement as set forth in paragraph II.E herein. The defendant understands that it is within the sole and exclusive discretion of the government to determine whether the defendant has provided substantial assistance.

The defendant understands that the government may recommend a reduction in her sentence of less than 50% or no reduction at all; depending upon the level of assistance the government determines that the defendant has provided.

The defendant further understands that a motion pursuant to U.S.S.G. § 5K1.1 is only a recommendation and is not binding on the Court, that this plea agreement confers no right upon the defendant to require that the government make a § 5K1.1 motion, and that this plea agreement confers no remedy upon the defendant in the event that the government declines to make a § 5K1.1 motion. In particular, the defendant agrees not to try to file a motion to withdraw her guilty plea(s) based on the fact

that the government decides not to recommend a sentence reduction or recommends a sentence reduction less than the defendant thinks is appropriate.

If the government determines that the defendant has provided further cooperation within one year following sentencing, the government may move for a further reduction of her sentence pursuant to Rule 35 of the Federal Rules of Criminal Procedure.

### C. Use of Information for Sentencing.

The government is free to provide full and accurate information to the Court and Probation, including answering any inquiries made by the Court and/or Probation and rebutting any inaccurate statements or arguments by the defendant, her attorney, Probation, or the Court. The defendant also understands and agrees that nothing in this Plea Agreement bars the government from defending on appeal or collateral review any sentence that the Court may impose.

### IV. ELEMENTS OF THE OFFENSE

At a trial, the government would have to prove beyond a reasonable doubt the following elements of the offense to which the defendant is pleading guilty, specifically wire fraud in violation of 18 U.S.C. § 1343:

First, the defendant knowingly participated in, devised, or intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises;

Second, the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

Third, the defendant acted with the intent to defraud, that is, the intent to deceive or cheat; and

Fourth, the defendant used, or caused to be used, a wire communication to carry out or attempt to carry out an essential part of the scheme.

A wiring is caused when one knows that a wire will be used in the ordinary course of business or when one can reasonably foresee such use.

It need not have been reasonably foreseeable to the defendant that the wire communication would be interstate in nature. Rather, it must have been reasonably foreseeable to the defendant that

some wire communication would occur in furtherance of the scheme, and an interstate wire communication must have actually occurred in furtherance of the scheme.

With respect to bank fraud in violation of 18 U.S.C. § 1344, the government would have to prove the following elements of the offense beyond a reasonable doubt:

First, the defendant knowingly carried out a scheme or plan to obtain money or property from a financial institution by making false statements or promises;

Second, the defendant knew that the statements or promises were false;

Third, the statements or promises were material; that is, they had a natural tendency to influence, or were capable of influencing, a financial institution to part with money or property;

Fourth, the defendant acted with the intent to defraud; and

Fifth, the financial institution was federally insured.

The defendant fully understands the nature and elements of the crimes charged in the indictment to which she is pleading guilty, together with the possible defenses thereto, and has discussed them with her attorney.

## V. MAXIMUM SENTENCE

### A. Maximum Penalty.

The maximum sentence that the Court can impose with respect to wire fraud affecting a financial institution in violation of 18 U.S.C. § 1343 as charged in Count One is 30 years of incarceration, a fine of $1 million, a five-year period of supervised release and a special assessment of $100. The maximum sentence that the Court can impose with respect to bank fraud in violation of 18 U.S.C. § 1344 as charged in Count Seventeen is 30 years of incarceration, a fine of $1 million, a five-year period of supervised release and a special assessment of $100.

By signing this plea agreement, the defendant also agrees that the Court can order the payment of restitution for the full loss caused by the defendant's wrongful conduct. The defendant agrees that the restitution order is not restricted to the amounts alleged in the specific count(s) to which she is pleading guilty. The defendant further agrees, as noted above, that she will not attempt to discharge in any present or future bankruptcy proceeding any restitution imposed by the Court.

B. **Violations of Supervised Release.**

The defendant understands that if she violates a condition of supervised release at any time during the term of supervised release, the Court may revoke the term of supervised release and require the defendant to serve up to five additional years imprisonment.

## VI. SENTENCING DETERMINATION

A. **Statutory Authority.**

The defendant understands that the Court must consult the Federal Sentencing Guidelines and must take them into account when determining a final sentence. The defendant understands that the Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the Sentencing Guidelines and must take them into account when determining a final sentence. The defendant further understands that the Court will consider whether there is a basis for departure from the guideline sentencing range (either above or below the guideline sentencing range) because there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines. The defendant further understands that the Court, after consultation and consideration of the Sentencing Guidelines, must impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

B. **Stipulations Affecting Guideline Calculation.**

The government and the defendant agree that there is no material dispute as to the following sentencing guidelines variables and therefore stipulate to the following:

1. Base Offense Level: +7 (statutory maximum term exceeds 20 years - § 2B1.1(a)(1))

2. Loss Amount: +20 (loss amount exceeds $9.5 million - § 2B1.1(b)(1)(K))

3. Abuse of Position of Trust: +0 or +2 (parties are free to argue) (position of trust was as an escrow agent - § 3B1.3)

4. Acceptance of Responsibility: See paragraph III.B.2 above

5. Criminal History: The parties estimate, but do not stipulate, that the defendant's criminal history category will be I.

6. Other enhancements: The Government expressly agrees not to pursue any enhancement for sophisticated means or leader/organizer in the District Court.

PLEA AGREEMENT 9

7. Estimated Sentencing Range (assuming the guidelines calculations above, acceptance of responsibility, and Criminal History Category I): 24/I = 51-63 months or 26/I = 63-78 months

8. Departures or Other Enhancements or Reductions: The defendant is free to recommend to the Court whatever sentence she believes is appropriate under 18 U.S.C. § 3553(a).

## VII.  WAIVERS

### A.  Waiver of Constitutional Rights.

The defendant understands that by pleading guilty she is waiving the following constitutional rights: (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to be assisted at trial by an attorney, who would be appointed if necessary; (d) to subpoena witnesses to testify on her behalf; (e) to confront and cross-examine witnesses against her; and (f) not to be compelled to incriminate herself.

### B.  Waiver of Appeal and Collateral Attack.

The defendant understands that the law gives the defendant a right to appeal her guilty plea, conviction, and sentence. The defendant agrees as part of her plea(s), however, to give up the right to appeal the guilty plea, conviction, and the sentence imposed in this case as long as the sentence does not exceed the statutory maximum(s) for the offense(s) to which she is pleading guilty. The defendant specifically gives up the right to appeal any order of restitution the Court may impose.

Notwithstanding the defendant's waiver of appeal, the defendant will retain the right to appeal if one of the following circumstances occurs: (1) the sentence imposed by the District Court exceeds the statutory maximum; and/or (2) the government appeals the sentence in the case. The defendant understands that these circumstances occur infrequently and that in almost all cases this Agreement constitutes a complete waiver of all appellate rights.

In addition, regardless of the sentence the defendant receives, the defendant also gives up any right to bring a collateral attack, including a motion under 28 U.S.C. § 2255 or § 2241, challenging any aspect of the guilty plea, conviction, or sentence, except for non-waivable claims.

Notwithstanding the government's agreements in paragraph III.A above, if the defendant ever attempts to vacate her plea(s), dismiss the underlying charges, or modify or set aside her sentence on any of the counts to which she is pleading guilty, the government shall have the rights set forth in Section

PLEA AGREEMENT                           10

II.E herein.

### C. Waiver of Attorneys' Fees and Costs.

The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the investigation and prosecution of all charges in the above-captioned matter and of any related allegations (including without limitation any charges to be dismissed pursuant to this plea agreement and any charges previously dismissed).

## VIII. ENTIRE PLEA AGREEMENT

Other than this plea agreement, no agreement, understanding, promise, or condition between the government and the defendant exists, nor will such agreement, understanding, promise, or condition exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and counsel for the United States.

## IX. APPROVALS AND SIGNATURES

### A. Defense Counsel.

I have read this plea agreement and have discussed it fully with my client. The plea agreement accurately and completely sets forth the entirety of the agreement. I concur in my client's decision to plead guilty as set forth in this plea agreement.

Dated: 12/15/17

_____
WILLIAM PORTANOVA
Attorney for Defendant

### B. Defendant:

I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my case. No other promises or inducements have been made to me, other than those contained in this plea agreement. In addition, no one has threatened or forced me in any way to enter into this plea agreement. Finally, I am satisfied with the representation of my attorney in this case.

Dated: 12/15/17

MARY SUE WEAVER
Defendant

C. **Attorney for United States:**

I accept and agree to this plea agreement on behalf of the government.

Dated: "[Click & Type Name]"
12-15-17

PHILLIP A. TALBERT
United States Attorney

MICHAEL D. ANDERSON
HEIKO P. COPPOLA

Assistant United States Attorneys

PLEA AGREEMENT 12

## EXHIBIT "A"

## Factual Basis for Plea

Beginning in or about June 2004 and continuing to in or about April 2008, Abolghasseni "Abe" Alizadeh ("Alizadeh") and Mary Sue Weaver knowingly devised, participated in and executed a material scheme to defraud and obtain money and property affecting financial institutions in the Eastern District of California. Alizadeh and Weaver executed the scheme utilizing materially false and fraudulent pretenses, representations, promises and the concealment of material facts.

Alizadeh was a major Sacramento-area commercial real estate developer and owned Kobra Properties, a property development company. Alizadeh was also the sole or part owner of many other businesses. Mary Sue Weaver was a senior escrow agent at Placer title. Weaver handled all of the large commercial real estate transactions for Placer Title. Alizadeh used Weavers's services on hundreds of his transactions. In each escrow file Weaver handled for Alizadeh, there was a one-page note stating that all requests by someone outside of the escrow were to be approved by Weaver, Alizadeh or an attorney. Weaver's other client files did not have similar notes.

Alizadeh came up with a scheme where, using his development company Kobra Properties, he would get loans to buy land that he planned to develop. Because Alizadeh was a well-known major commercial real-estate developer, title companies and banks would compete for his business. Banks usually loan up to 60-65% loan to value (LTV) on undeveloped commercial property. To circumvent the banks and fraudulently get a higher level of financing, Alizadeh would submit altered purchase contracts to the bank that greatly inflated the purported purchase price. The banks would loan what they thought was 60-65% of the value of the property, but in reality was a much greater percentage LTV— sometimes in excess of 100%. By concealing the true purchase price from the banks, the scheme allowed Alizadeh to receive substantial amounts of cash, sometimes millions of dollars, at the close of escrow and avoid making the full down payment or any down payment.

In some cases, to get the money out of escrow and to make it look like he made a down payment, Alizadeh would write checks for his down payment on the property. With respect to the charges contained within the indictment, Alizadeh did not have the funds to cover the checks. Alizadeh would then call Weaver, advise her that he could not cover the checks and would pressure Weaver to delay depositing the down payment checks. At Alizadeh's direction and because she wanted to keep Alizadeh's business, in the transactions charged in the indictment, Weaver would delay depositing some or all of Alizadeh's down payment until after escrow closed. Once escrow closed, Weaver disbursed funds from Placer Title's escrow trust account to Kobra Properties. Kobra Properties then used those funds to cover its purported down payment check or checks which Weaver then deposited. In this way, Alizadeh and Kobra Properties made it appear as though it was making a substantial down payment, when in fact it was using escrow funds and not making a down payment in the amount claimed. At Alizadeh's request, Weaver would provide inconsistent settlement statements to the buyer and seller. Weaver also caused wires to be sent in interstate commerce to the property seller transferring money in the amount of the purchase price.

The loss attributable to Alizadeh and Weaver between June 2004 and April 2008 as charged in the indictment for the use of this scheme is approximately $22,905,178.10.

**1. Count One – Wire Fraud:**

On April 29, 2005, Kobra Properties purchased 10.3 acres located at the northeast corner of Blue Oaks Blvd. and Woodcreek Oaks Blvd. in Roseville from Roseville Technology Park Associates, LLC. Central Pacific Bank financed the purchase and wired $3,952,625.00, which traveled in interstate commerce, to Placer Title Company on April 29, 2005. In order to obtain a loan for the purchase of the property, on or about February 23, 2005, Kobra Properties submitted a fraudulent purchase agreement to

PLEA AGREEMENT  A-1

_MSW_ Initials

Central Pacific Bank showing that the purchase price of the property was $5,663,800. According to a Central Pacific loan officer, based in part on this contract, Central Pacific loaned Kobra $3,975,000 to purchase the land. Central Pacific Bank believed that this represented an LTV of 70%. In addition, Central Pacific Bank loaned Alizadeh $250,000 in an unsecured loan for entitlement and development costs on the property. This loan was specifically not to be used for any costs associated with the purchase of the property. According to Roseville Technology Park's copy of the purchase agreement, the property was actually sold to Kobra for $4,138,200. At the actual purchase price, the LTV was over 96%.

A witness employed by CB Richard Ellis represented Roseville Technology Park Associates in the deal. When interviewed by agents, the witness stated the sales price was approximately $4.1 million and that during the negotiations he would email the purchase agreement back and forth between himself, Alizadeh and S.C. The witness said that he personally delivered the actual purchase agreement to Sue Weaver at Placer Title. The witness also pointed out an important error in the fraudulent purchase agreement—the price per square foot is the same in both the legitimate and forged purchase agreements. As a result, the numbers do not add up correctly in the fraudulent agreement.

Agents also interviewed the president of Longmeadow Development Corporation, the seller. This witness stated that the agreement was for approximately $4.1 million and that the $4.1 million agreement was signed by the parties and by Sue Weaver on behalf of Placer Title. When shown the $5.6 million contract that had been submitted to Central Pacific, the witness stated that it was not the correct agreement and identified the price per square foot problem. He stated that Alizadeh's initials were different on the documents, some of the spacing was different, and the method of writing the dates varied. Most importantly, the witness' initials were not on page 7 with the indemnification provisions. The witness stated that a purchase contract could not pass through escrow without both the buyer and seller initialing the indemnification provision. The certified seller's closing statement prepared by Placer Title and sent to Roseville Technology also shows that the purchase price was $4,138,200.

The escrow file from Placer Title contains buyer's and seller's final closing statements. Both statements show a sales price of $4,138,200, but the buyer's statement also shows a deposit of $1,623,539 by Kobra Properties. Kobra Properties' deposit was made on April 28, 2005. This money was then largely disbursed back to Kobra Properties on April 29, 2005, as "Engineering/Development Expense" in the amount of $1,524,375.60.

The property was eventually foreclosed upon by Central Pacific Bank in or about December 2011. The unpaid loan amount at the time of foreclosure was approximately $4,496,646.91.

**2. Count 17 – Bank Fraud:**

On October 21, 2005, Alizadeh purchased Turtle Island, through Kobra Properties, from the seller for $10 million. On April 25, 2005, an attorney for Alizadeh, faxed an unsigned letter of intent to Escrow Agent Sue Weaver at Placer Title. The letter indicated that the purchase price was $10 million.

The final contract is dated August 23, 2005. There are two nearly identical versions. The seller had a version that lists the sales price as $10 million. According to the Bank of the West VP/Relationship Manager, Alizadeh submitted a version to Bank of the West and to appraiser PGP that showed the contract purchase price was $21,954,240. Fifteen prior drafts of the contract obtained from Kobra Properties show that the early drafts of the contract consistently listed the purchase price as $10 million. A copy of the purchase agreement found in Kobra Properties' files shows a purchase price of $10 million. Trainor-Fairbrooks, formerly Trainor Roberts, which was the law firm who represented Alizadeh, also provided the actual purchase contract listing a purchase price of $10 million.

In an interview with agents and in a civil deposition, the seller confirmed the actual purchase price was $10 million. He stated that in late 2009, Alizadeh asked him to meet at Brookfield's

PLEA AGREEMENT         A-2

_____ Initials

restaurant in Roseville. Once at the restaurant, Alizadeh asked the seller to sign a document saying that the seller sold the property for "20 something million dollars" but that he had refused and walked out of the restaurant. Alizadeh also signed a county transfer tax document showing that the purchase price was $10 million.

A real estate attorney represented the seller in several transactions with Alizadeh and Kobra Properties, including the Turtle Island/Loomis Marketplace transaction, which involved an approximately 63-acre parcel of property. In an interview with agents, the real estate attorney recalled that the seller sold the property to Alizadeh several years ago for $10 million. Approximately eight months after Alizadeh declared bankruptcy with Kobra Properties, the real estate attorney received a phone call from the seller. The seller told the real estate attorney that Alizadeh asked the seller to say Alizadeh purchased Turtle Island for approximately $22 million if any one asked. The seller reported to the real estate attorney that he told Alizadeh "hell no" because the sales contract said $10 million and the seller filed tax returns indicating that the sale price was $10 million.

On August 25, 2005, Weaver signed the Acknowledgement of Escrow Holder on the Purchase and Sale Agreement. The purchase agreement Alizadeh submitted to Placer Title shows a contract purchase price of $10 million. The actual purchase price was further corroborated by the Preliminary Change of Ownership report filed with Placer County and signed by Alizadeh. This document is used by the county to calculate the transfer tax payable on the sale of the property. The Preliminary Change of Ownership document was prepared with a purchase price of $10 million and signed by Alizadeh on or about October 20, 2005.

Alizadeh, through Kobra Properties, deposited $9,434,240.00 into escrow on October 20, 2005, utilizing a business check drawn on the Mechanics Bank operating account of Kobra Properties. To cover the check, money was transferred by check out of escrow to Kobra Properties. These transfers were concealed with three checks from Placer Title Company escrow number 110-2806. The checks, totaling $9,434,240.00 (exactly the same amount that Kobra Properties deposited into escrow) were disguised as disbursements for rezoning fees, entitlements and consultants. There is no evidence that this work was ever done. An addition $1,691,468.61 was transferred by check from Placer Title Company to the Kobra Properties Mechanics Bank. Only $10 million went to the seller.

Records obtained from Placer Title company show that Weaver received a check from Kobra Properties in the amount of $9,434,240.00 on October 20, 2005. She then prepared a Placer Title Company receipt of funds and Comerica Bank deposit ticket both dated October 20, 2005. The Escrow Float Inquiry is a report generated by the Placer Title Company accounting department. It notes that on October 20, 2005, Weaver receipted into escrow 110-2806, a check from Kobra Properties in the amount of $9,434,240.00. Sometime after October 20, 2005 but prior to October 25, 2005, the accounting department inquired of Weaver if the $9,434,240.00 receipt and deposit ticket should be voided since no funds had been deposited into the Comerica Bank trust account. October 25, 2005, Weaver responded that the deposit "is going in." Records demonstrate that Weaver deposited the funds on October 25, 2005.

Weaver also prepared the Placer Title Company "Escrow Receipts" report for escrow number 110-2806, which was the number assigned to the Turtle Island transaction. This escrow receipts report summarizes all deposits into escrow and includes buyer deposits, wire transfers, from financing sources and other miscellaneous credits to escrow. According to the Escrow Receipts report prepared by Weaver, she receipted in and deposited into Comerica Bank $22,634,527.70 for the benefit of Kobra Properties for escrow 110-2806. This amount well exceeds the $10 million sales price recorded on the Placer Title Closing Statements and in the purchase contract signed by Weaver at Placer Title.

//

//

PLEA AGREEMENT        A-3

_____ Initials

According to the Bank of the West VP/Relationship Manager, Bank of the West obtained title to the property and sold it for less than $2 million. The resulting loss was approximately $13 million.

Bank of the West was insured by the Federal Deposit Insurance Corporation ("FDIC").

Dated: 12/15/17

*[signature]*
MARY SUE WEAVER
Defendant

PLEA AGREEMENT — A-4

*[initials]* Initials